**Opinion issued December 5, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00316-CV

———————————

## JOHNNIE AGUILAR, Appellant

## V.

## TERRI M. BRECKENRIDGE, Appellee

---

**On Appeal from County Court at Law No. 2**
**Fort Bend County, Texas**
**Trial Court Case No. 10-CCV-042016**

---

## MEMORANDUM OPINION

Terri Breckenridge sued Johnnie Aguilar for breach of a loan agreement.

Following a bench trial, the trial court rendered judgment against Aguilar for

$8,882 in favor of Breckenridge. On appeal, Aguilar, acting pro se, presents four issues challenging the judgment.

We affirm.

## Background

Terri Breckenridge moved into a home located at 36615 Maverick, which was owned by Aguilar. Initially, Breckenridge moved in as a tenant with the agreement that she would purchase the home. Within 14 days of moving in, Breckenridge came home from work to find red foreclosure stickers on the house. Breckenridge contacted Aguilar's real estate agent regarding the foreclosure.

After conferring with Aguilar, the agent informed Breckenridge that the Maverick property was in foreclosure. The agent told Breckenridge that she could prevent the foreclosure and pursue purchasing the property if she loaned Aguilar the money necessary to avoid foreclosure. The real estate agent told Breckenridge that this would allow her to close on the Maverick property on the scheduled closing date.

Breckenridge met Aguilar and the real estate agent at her bank. There, Breckenridge wrote a check to "cash" with Aguilar's name appearing in the memo portion of the check. With these funds, Aguilar immediately obtained a cashier's check made out to StarTex Title to pay off the balance he owed on the Maverick property to forestall foreclosure.

2

Breckenridge's closing on the Maverick property occurred on July 31, 2006. At the closing, Breckenridge received a Real Estate Lien Note ("Lien Note") signed by Aguilar. The Lien Note reflected a principal amount of $8,882. The annual interest rate on the loan was 18 percent. Aguilar was identified as the maker of the Lien Note, and Breckenridge was identified as a payee. The Lien Note stated the loan was secured by a piece of real property located in Pasadena, Texas at 913 Sunset ("the Sunset property"). The "terms of payment" stated in the Lien Note were as follows: "One principle payment due of $8,882.00 plus accrued interest, payable upon the successful resale, closing and funding of the [Sunset] property as described . . . as security for this note."

Nearly four years later, on April 1, 2010, Breckenridge's attorney sent Aguilar a letter, by certified mail, demanding Aguilar to pay Breckenridge the $8,882.00 he owed under the Lien Note. Aguilar signed the certified mail receipt indicating that he received the demand letter. Aguilar did not pay Breckenridge any money.

On May 13, 2010, Breckenridge sued Aguilar for breaching the Lien Note. Aguilar responded to the suit by filing a pro se dismissal in which he claimed that he never owned the Maverick property, had received no money from Breckenridge, and had not signed the Lien Note. He also claimed that he had never owned the Sunset property securing the Lien Note.

3

Breckenridge's claim was tried to the bench on February 16, 2012. At trial, Breckenridge testified that she had loaned Aguilar the money to stop foreclosure of the Maverick property. She identified Aguilar in the courtroom as the person to whom she gave the check at the bank. Breckenridge also identified him as the person who was at the closing of the Maverick property on July 31, 2006. Breckenridge indicated that Aguilar had never paid her the $8,882.00 he owed her under the Lien Note.

As support for her claim, Breckenridge offered the following documents into evidence: (1) the Lien Note; (2) a copy of the check written by Breckenridge to "cash" and given to Aguilar at the bank; (3) the cashier's check obtained by Aguilar made payable to StarTex Title; and (4) closing documents showing that Breckenridge purchased the Maverick property from Aguilar. Breckenridge also offered the letter sent by her attorney to Aguilar demanding payment of the $8,882.00. The exhibit included the certified mail return receipt signed by Aguilar.

Aguilar also testified at trial. He stated that he did not own or sell the Maverick property to Breckenridge and that he had never met her before trial. Aguilar also testified that he did not own or sell the Sunset property securing the Lien Note.

Aguilar denied signing the Lien Note. He pointed out that the Lien Note was signed "Johnnie E. Aguilar." He claimed that he always signed his name

"Johnnie Aguilar" and never signed it "Johnnie E. Aguilar." Aguilar, however, admitted that it was his signature on the certified mail return receipt indicating he had received the demand letter.

Aguilar claimed that he had been the victim of some type of scam or fraud with respect to the sale of the Maverick property. Aguilar was not able to develop this defensive theory, however, because it required him to testify regarding what other people had told him. The trial court sustained Breckenridge's objections to this testimony on hearsay grounds.

Aguilar's brother, Nick, also testified. Nick stated that Aguilar signed his name "Johnnie Aguilar," not "Johnnie E. Aguilar," as reflected on the Lien Note. Nick's testimony also indicated that he believed his brother had been defrauded with respect to the sale of Maverick property. When Nick began to explain the basis for this belief, Breckenridge objected to the testimony on hearsay grounds. Breckenridge's hearsay objections were sustained.

At the close of evidence, Breckenridge moved for an "instructed verdict," which the trial court granted in her favor. The trial court stated that it found Aguilar's signature was "on all these documents," which included the Lien Note.

The trial court rendered judgment against Aguilar in favor of Breckenridge for $8,882. Findings of fact and conclusions of law were neither requested nor filed.

5

This appeal followed. Aguilar identifies four issues.

## Legal Sufficiency

In his second issue, Aguilar asserts that there is no evidence in the record to show that Breckenridge "made [an] $8,000.00 loan" to him. We view this as a legal sufficiency challenge to the evidence supporting the trial court's judgment.

On appeal from a nonjury trial without findings of fact and conclusions of law, it will be implied that the trial court made all findings necessary to support its judgment. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83–84 (Tex. 1992). Without findings of fact and conclusions of law, the trial court's judgment will be affirmed if it can be upheld on any legal theory that finds support in the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984). When, as here, a reporter's record is brought forward, these implied findings may be challenged on appeal by legal or factual sufficiency issues. *See Holt Atherton*, 835 S.W.2d at 84.

In reviewing a "no evidence" or legal sufficiency challenge to the evidence, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). The appellant must demonstrate that there is no evidence to support the finding when he attacks the legal sufficiency of a finding

6

on which he did not have the burden of proof. *See Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). We may not sustain a legal sufficiency or "no evidence" point unless the record demonstrates that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810.

Aguilar claims that "[t]here is not one document, check, receipt, [or] deposit slip that shows that [Aguilar] received any money from any source from [Breckenridge]." We disagree.

Breckenridge offered into evidence the Lien Note, reflecting that she made a loan to Aguilar in the principal amount of $8,882.00. The Lien Note indicates that Aguilar was the maker of the Lien Note, and Breckenridge was a payee. The Lien Note was signed by Aguilar.

The trial court admitted into evidence a copy of a check from Breckenridge's personal checking account. It was signed by Breckenridge and made out to "cash." The memo line on the check had the notations of "Johnnie Aguilar" and "StarTex Title."

Breckenridge also introduced a copy of a cashier's check. It had the same date as the personal check and was for the same amount. The cashier's check reflected that it was paid to StarTex Title. The cashier's check also reflected, "REM: JOHNNIE AGUILAR," an indication that it was remitted by Aguilar.

In addition, Breckenridge testified that she had loaned Aguilar the money to prevent foreclosure of the Maverick property. She positively identified him in the courtroom as the person to whom she had made the loan. Breckenridge indicated that Aguilar was the person to whom she had met at her bank and to whom she had given the check made out to cash. Breckenridge testified that she received the Lien Note evidencing the loan at the closing of the Maverick property, which she purchased from Aguilar. She indicated that Aguilar had never paid her back the money she had loaned him.

Viewing the evidence as we must, we hold that Breckenridge offered legally sufficient evidence to show that she loaned Aguilar the money. We overrule Aguilar's second issue.

**Factual Sufficiency**

Aguilar's third issue raises questions about the veracity of Breckenridge's testimony that she had loaned Aguilar the money to avoid foreclosure. Aguilar appears to assert that the lack of Breckenridge's credibility undermines the trial court's implicit finding that Breckenridge had loaned money to him.

8

We view this as a factual sufficiency challenge to the evidence. To evaluate the factual sufficiency of the evidence, we consider all the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Aguilar points out that Breckenridge testified she had loaned Aguilar the money to avoid foreclosure because she was worried about not having a place to live. In the context of this testimony, Breckenridge commented that she had "no money." Aguilar asserts that Breckenridge's testimony indicating that she had no money is inconsistent with her claim that she loaned him money.

Aguilar in essence asks us to substitute our opinion for that of the trier of fact by finding Breckenridge not to be credible. "In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony." *Bush v. Bush*, 336 S.W.3d 722, 730 (Tex. App.—Houston [1st Dist.] 2010, no pet.). We defer to the credibility assessments made by the trial court. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000) ("Because the trier of fact has the ability to examine the witness's demeanor, we must defer to its credibility determinations."). Here, it

9

was within the trial court's discretion, as trier of fact, to believe Breckenridge's testimony that she loaned Aguilar the money. *See City of Keller*, 168 S.W.3d at 815–17.

We conclude that the evidence supporting the trial court's implied finding that Breckenridge loaned Aguilar the money was not so against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. We hold the evidence is factually sufficient to support the judgment.

We overrule Aguilar's third issue.

### The Lien Note

In his first issue, Aguilar asserts that the Lien Note is not a negotiable instrument, as defined by Texas's version of the Uniform Commercial Code, because it was not payable on demand or at a definite time. *See* TEX. BUS. & COM. CODE ANN. § 3.104(a)(2), § 3.106 (Vernon Supp. 2013). He points out that the Lien Note was not payable until the Sunset property, securing the Lien Note, was sold.

Aguilar, however, does not explain the significance of the Lien Notes' status as a negotiable instrument. Because the suit is between the original parties to the instrument, whether the Lien Note is a negotiable instrument is not relevant. *See Ropa Exploration Corp. v. Barash Energy, Ltd*., No. 02-11-00258-CV, 2013 WL 2631164, *5 (Tex. App.—Fort Worth June 13, 2013, pet. filed) (mem. op.);

10

*Mauricio v. Mendez*, 723 S.W.2d 296, 298 (Tex. App.—San Antonio 1987, no writ).

Aguilar also asserts that the Lien Note was not a "promissory note" because it was conditioned on the successful sale, closing, and funding of the Sunset property.[1] *See Edlund v. Bounds*, 842 S.W.2d 719, 724 (Tex. App.—Dallas 1992, writ denied). We have stated that "[a] promissory note is nothing more than a contract evincing an obligation to pay money." *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). "As such, the construction of its terms is controlled by the rules generally applicable to interpreting contracts." *Id*.; *see Mauricio*, 723 S.W.2d at 298 ("[L]iability on the instrument is not governed by the law of negotiable instruments, but by the law of contracts.").

---

[1] The Lien Note required Aguilar to repay Breckenridge the $8,882.00 that she had loaned him "upon the successful resale, closing and funding of the [Sunset] property." In her petition, Breckenridge specifically pleaded that "[a]ll conditions precedent have been performed by Breckenridge, if any, or have occurred allowing demand and collection of monies loaned pursuant to the terms of the Promissory Note." When a plaintiff alleges "all conditions precedent have been performed or have occurred," a defendant must specifically deny any conditions that were not performed or have not occurred. TEX. R. CIV. P. 54; *Greathouse v. Charter Nat'l Bank-Sw.*, 851 S.W.2d 173, 174 (Tex. 1992). When a defendant does not specifically deny a plaintiff's performance-of-conditions-precedent pleading, a plaintiff is not encumbered with proof of such performance. *See Rockwall Commons, Ltd. v. MRC Mortg. Grantor Trust I*, 331 S.W.3d 500, 508 Tex. App.—El Paso 2010, no pet.). Here, Aguilar only claimed that *he* "did not buy or sell the [Sunset property]." Aguilar never specifically denied that the conditions precedent triggering his obligation to repay the loan, i.e., the successful resale, closing and funding of the Sunset property, had occurred.

11

The elements of a breach of contract action are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Dorsett*, 106 S.W.3d at 217. Other than claiming that no evidence showed Breckenridge loaned him the money, as discussed above, Aguilar makes no additional assertion challenging the sufficiency of the evidence to support the trial court's determination that Breckenridge was entitled to recover on her claim that Aguilar breached the loan agreement. The record shows that Breckenridge offered evidence supporting the elements of her claim.

We overrule Aguilar's first issue.

## Instructed Verdict

In his fourth issue, Aguilar asserts that "the findings of the trial court are void" because "the trial court erred in granting an instructed verdict at a bench trial."

After Aguilar presented his evidence, Breckenridge moved for an "instructed verdict." The trial court stated that it found in favor of Breckenridge "based on the instructed verdict." This, however, was a misnomer. *See McDaniel v. Carruth*, 637 S.W.2d 498, 505 (Tex. App.—Corpus Christi 1982, no writ) (stating that granting of instructed verdict in a bench trial is a misnomer). As one court of appeals noted, "A judge does not instruct himself to render a verdict." *Id.*

12

Irrespective of the misnomer, the trial court rendered judgment only after Aguilar was given the opportunity to present evidence regarding the disputed facts and his defenses. *See* TEX. R. CIV. P. 262 (providing that rules governing trial before a jury shall govern trials by court where applicable); TEX. R. CIV. P. 265 (specifying order of proceedings in jury trials); *cf. Producer's Const. Co. v. Muegge*, 669 S.W.2d 717, 718–19 (Tex. 1984) (reversing trial court's judgment because defendant "was not given an opportunity to present its defense and evidence in support of its counterclaims" in case tried to the bench). Moreover, nothing in the record indicates that the misnomer caused the rendition of an improper judgment, or prevented Aguilar from properly presenting his case on appeal. *See* TEX. R. APP. P. 44.1(a).

We overrule Aguilar's fourth issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Massengale.


13